IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| RICHARD J. POLLAK, JR., | ) | CASE NO. 02-44178-H3-7 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| RICHARD J. POLLAK, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ADV. NO. 04-3906 |
| | ) | |
| HOMESIDE LENDING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

The court has held a trial on the above captioned
adversary proceeding.  The following are the Findings of Fact and
Conclusions of Law of the court.  A separate conforming Judgment
will be entered.  To the extent any of the Findings of Fact are
considered Conclusions of Law, they are adopted as such.  To the
extent any of the Conclusions of Law are considered Findings of
Fact, they are adopted as such.

<u>Findings of Fact</u>

Richard J. Pollak, Jr. ("Debtor") filed a voluntary
petition under Chapter 13 of the Bankruptcy Code on December 2,
2002.

In the instant adversary proceeding, Debtor objects to the claim of Homeside Lending, Inc. ("Homeside"),[1] and seeks affirmative relief against Homeside, pursuant to the Real Estate Settlement Procedures Act, Texas Debt Collection Practices Act, and Texas Deceptive Trade Practices Act.  Debtor's request for relief is based on Debtor's allegation that Homeside misapplied payments made by Debtor.

On April 24, 2001, Debtor executed a note, in the original principal amount of $73,150, payable to Bank One, N.A. ("Bank One") and a deed of trust, to finance the purchase of a home, located at 4541 County Road 138A, Alvin, Texas. (Defendant's Exhibit 1).  Debtor made the regular monthly payments on the loan prior to September, 2001.  The monthly payments were set to include principal and interest, and an escrow of funds for payment of taxes and insurance.

The note provides in pertinent part:

> "[t]he Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

[1] Homeside has been acquired by Washington Mutual. Homeside's witness Sean Waelde, a research analyst who now works for Washington Mutual, worked for Homeside prior to the acquisition of Homeside by Washington Mutual.  For convenience and clarity, in this opinion, only "Homeside" is used to refer to the entity, before and after its acquisition by Washington Mutual.

(Defendant's Exhibit 1).

In September, 2001, in addition to Debtor's regular monthly payment, Debtor sent to Bank One a payment of $813.48.[2] Debtor intended that the payment be applied to Debtor's next monthly payment. However, Bank One applied the payment as a "principal curtailment," reducing the amount of principal owing on the note, but not advancing the Debtor's due date for a next payment. Bank One applied the payment on or about September 28, 2001.

On October 15, 2001, Bank One sent to Debtor notice that the servicing of the note would be transferred to Homeside, effective on November 1, 2001. (Debtor's Exhibit 4). Sean Waelde, a research analyst for Homeside, testified that the transfer of servicing actually occurred on November 7, 2001.

On November 28, 2001, an employee of Homeside applied funds from escrow to the December, 2001 regular monthly payment. (Homeside Exhibit 19). Waelde testified that the application of the escrow to the December, 2001 regular monthly payment was a mistake. He testified that the employee likely believed that there was an escrow surplus, but that that belief was mistaken, because the escrow had not been applied to pay 2001 real property

_____

[2]Debtor asserts that a second additional payment was sent, but neither the records of Homeside nor those of Bank One substantiate that such a payment was received. It appears likely that Debtor believed, at one point, that a payment applied from escrow, described below, was actually a second payment made by Debtor.

taxes.

On December 10, 2001, the funds in escrow were applied to the 2001 real property taxes, and $336.23 was refunded to Debtor.  Debtor testified that, after Homeside applied the escrow, it notified him that his escrow account was short, and increased the amount of his monthly payment by approximately $100.00, effective in April, 2002.

Debtor testified that, beginning at the time Debtor received notice that the amount of his monthly payment had been increased, and continuing through at least July, 2002, Debtor attempted to telephone Homeside, seeking to obtain a payment history of the loan.  He testified that he was unable to obtain a history showing what had happened between September and December, 2001.

Waelde testified that, in April, 2002, Debtor paid his regular monthly mortgage payment with a check that was returned for insufficient funds.  He testified that Debtor's May, 2002 payment was applied to April, 2002.  He testified that Debtor made a $2,000 payment on July 18, 2002, which was applied to the regular payments for May, and June, 2002.  Waelde testified, and Debtor admitted, that Debtor made no payments to Homeside after July 18, 2002, and before December 2, 2002, the date of filing of the petition in the instant Chapter 13 case.

On the date of the filing of the petition in the

4

instant Chapter 13 case, Debtor was represented by T. Frederick Jones, as counsel.

Debtor testified that he was unable to pay the higher monthly payment, because he had bought a new Toyota Rav 4 truck during December, 2001.  He testified that, between July 18, 2002 and December 2, 2002, he used the funds he otherwise would have used to pay his mortgage debt to Homeside to pay credit card debts.

On December 17, 2002, Debtor filed a Chapter 13 plan which, inter alia, proposed to pay $6,500 to Homeside on its arrearage claim with respect to Debtor's homestead.  (Docket No. 6, Case No. 02-44178-H3-13).

On December 23, 2002, Homeside filed a proof of claim, stating a principal balance of $69,068.41 and a prepetition arrearage amount of $6,756.69.  (Homeside Exhibit 3).

By order entered March 25, 2003, Debtor's plan was confirmed.  (Docket No. 12, Case No. 02-44178-H3-13).

Waelde testified that the arrearage amount in Homeside's proof of claim was calculated by adding the amounts of six missed payments, totaling $5,494.98, four months' accrued late charges, totaling $127.44, $680.92 in foreclosure attorney fees, and $410.35 in escrow shortage.  He did not testify as to the $43.00 property inspection fee included on the proof of claim.

5

On February 12, 2004, Debtor conferred with Eloise Guzman, and agreed to hire her to substitute as his counsel in the above captioned Chapter 13 case.

Guzman testified that she sent a letter on February 12, 2004, to Homeside and its counsel, which she believes is a "qualified written request" pursuant to the Real Estate Settlement Procedures Act ("RESPA").  The letter is not in evidence.

On February 24, 2004, Mortgage Electronic Registration Services, a nominee of Homeside, filed a motion for relief from stay with respect to the property covered by the instant note and deed of trust.  (Docket No. 17, Case No. 02-44178-H3-13).

On April 12, 2004, an agreed form of order was entered conditioning the automatic stay on Debtor's payment of regular monthly installments of $816.72 per month, and cure $5,811.81 in postpetition arrearage under the note by applying one payment held at that time in suspense, and making six additional monthly payments.  Although Guzman had not filed a motion to substitute as Debtor's counsel at that time, she signed the proposed form of order on Debtor's behalf.

Debtor sent a letter, dated September 17, 2004, to Homeside.  The letter purports to be a "qualified written request" under RESPA, and requests, <u>inter alia</u>, complete and itemized statements of the loan history, escrow account, suspense

6

account, professional fees, payments, and late charges. (Debtor's Exhibit 12).

Debtor testified that the only response he received to his letter was a letter dated November 19, 2004. The letter, which is in evidence, describes the dispute between Debtor and Homeside with respect to application of the extra payment Debtor made in September, 2001, and also describes Homeside's application of payments Debtor made during April through July, 2002. Attached to the letter are seven pages of what appear to be computer printouts, without explanation of how to read the information contained therein. (Homeside Exhibit 17).

Homeside introduced into evidence a letter, dated November 1, 2004, stating that Debtor's letter had been received and forwarded to Homeside's "Executive Response Center." (Homeside Exhibit 16).

At the trial on the instant adversary proceeding, the testimony of Waelde was taken out of sequence, in order to allow him to travel on the day on which he testified. Debtor testified before and after Waelde, and at the conclusion of Debtor's testimony, Debtor rested, except with respect to Guzman's testimony on attorney fees. At the conclusion of Debtor's case in chief, Homeside moved for a directed verdict, asserting that Debtor had presented no evidence to quantify an award of consequential damages. The court granted Homeside's motion.

7

Debtor testified that the dispute with Homeside caused the interest rate charged on his credit cards to increase. He testified that the dispute caused him to lose his job. He testified that the dispute with Homeside forced him into bankruptcy. However, on cross-examination, Debtor admitted that he was aware that his failure to make his monthly mortgage payments during the six month period prior to filing the instant Chapter 13 case adversely affected his credit. Debtor also admitted that he failed to make several payments with respect to the Toyota Rav 4 he had purchased in December, 2001.

Guzman filed an unsworn declaration with respect to her attorney fees (Docket No. 24), and adopted her declaration and the attached time records as her testimony. Her time records reflect 42.15 hours of attorney time, at a rate of $275 per hour, and 1.3 hours of paralegal time, at a rate of $60 per hour. The services reflected in the time records include preparation of a RESPA request, preparation of the complaint in the instant adversary proceeding, attendance at two status conferences, preparation of discovery, and appearance at trial.

The issues remaining with respect to the instant adversary proceeding are: determination of the amount of Homeside's arrearage claim; determination of whether Homeside's conduct violated RESPA, the Texas Debt Collection Practices Act, and Texas Deceptive Trade Practices Act; and determination of any

8

damages to which Debtor is entitled.

Conclusions of Law

Section 502(b) of the Bankruptcy Code provides that, if an objection to a claim is made, the court shall determine the amount of the claim as of the date of filing of the petition, and shall allow the claim in such amount.

When a proof of claim in bankruptcy is filed, the party filing the claim is presumed to have made a prima facie case against the debtor's assets.  The objecting party must produce evidence rebutting the presumption raised by the proof of claim. If such evidence is produced, the party filing the claim must then prove by a preponderance of the evidence the validity of the claim.  The claiming party, through this process, bears the ultimate burden of proof.  In re Fidelity Holding Company, Ltd., 837 F.2d 696, 698 (5th Cir. 1988); In re Missionary Baptist Foundation of America, 818 F.2d 1135, 1143-1144 (5th Cir. 1987).

In the instant case, Homeside proved that it properly applied Debtor's prepayment to reduce the principal balance. Homeside proved its claim for principal, in the amount of $69,068.41.  As to the prepetition arrearage, Homeside proved missed payments, late charges, foreclosure attorney fees and costs, and an escrow shortage.  However, the missed payments do not reflect Homeside's misapplication of the escrow funds in December, 2001.  If Homeside had correctly applied the escrow

9

funds, no escrow shortage would have resulted in 2001.  However, in light of Debtor's failure to make payments, an escrow shortage would have arisen later, when Homeside would have applied funds in the escrow account to the principal and interest payments missed by Debtor, beginning in July, 2002.  The court concludes that the net result of Homeside's misapplication of the escrow funds in December, 2001 is that Homeside's arrearage claim must be reduced by $603.00, representing the interest accrued on the difference in the amount of escrowed funds, $102.35 per month, for six months at 6.5 percent interest.  Additionally, the arrearage claim must be reduced by $43.00, based on Homeside's failure to prove the property inspection fee.  The court concludes that the amount of the prepetition arrearage claim proven by Homeside is $6,110.69.

Upon receipt of a "qualified written request," the servicer must acknowledge receipt within 20 days and respond within 60 days.  12 U.S.C. § 2605(e).

Whoever fails to comply is liable for each such failure for actual damages, plus any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.  12 U.S.C. § 2605(f)(1).  In addition, in the case of any successful action, the servicer is liable for the costs of the action, together with any attorneys fees incurred in connection

10

with such action as the court may determine to be reasonable under the circumstances.  12 U.S.C. § 2605(f)(3).

With respect to Debtor's cause of action under RESPA, Debtor bears the burden of proof.  In re Tomasevic, 275 B.R. 103 (Bankr. M.D. Fla. 2001).

In the instant case, Debtor proved that he sent to Homeside a qualified written request pursuant to RESPA on September 17, 2004.  Homeside acknowledged receipt, by letter dated November 1, 2004, 45 days after the date of Debtor's letter.  Homeside responded to Debtor, by letter dated November 19, 2004, 63 days after the date of Debtor's letter.

The court concludes that Homeside was not in compliance with RESPA.  However, such a conclusion does not fully resolve the matters before the court.  Debtor did not prove any actual damages resulting from Homeside's being 25 days late to acknowledge receipt of Debtor's letter, or three days late to respond.  The court concludes that Debtor is not entitled to an award of actual damages as a result of Homeside's late responses. However, Debtor has proven a pattern of noncompliance by Homeside, including Homeside's failure to provide a payment history to Debtor on Debtor's repeated requests, and Homeside's late response to Debtor's qualified written request.[3]  Based on

---

[3]The court notes that, while Homeside's November 19, 2004 letter to Debtor did not fully explain the underlying loan history and escrow history documents attached to the letter, the

11

Homeside's pattern of noncompliance, the court has determined that an award to Debtor of $1,000 is appropriate.  In addition, the court has determined that an award to Debtor of the reasonable attorney fees attributable to Homeside's pattern of noncompliance is appropriate.  The services reflected in Guzman's time records are reasonable, with the exception of 2.5 hours billed for a hearing on a motion for continuance.  A reasonable time for that hearing is .5 hours.  There is no evidence to controvert that the hourly rate is reasonable in the instant case.  The court concludes that an award of $11,119.25 in attorney fees is reasonable.

As to Debtor's causes of action pled under the Texas Debt Collection Practices Act, and Texas Deceptive Trade Practices Act, Debtor failed to prove a cause of action.

Based on the foregoing, a separate conforming Judgment will be entered.

Signed at Houston, Texas February 23, 2006.

LETITIA Z. CLARK
UNITED STATES BANKRUPTCY JUDGE

---

narrative letter did satisfy RESPA's requirement of a written explanation or clarification.